UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARK SHAFFER,                        )
                                     )
            Plaintiff,               )
                                     )
v.                                   )    CIVIL ACTION NO.
                                     )    18-10160-DPW
IEP TECHNOLOGIES, LLC, RANDY, )
DAVIS in his capacity as             )
President, & BURKE DESAUTELS, )
in his capacity as Manager,   )
                                     )
            Defendants.        )

MEMORANDUM AND ORDER
August 16, 2021

The Fair Labor Standards Act of 1938 (the "FLSA"), 29
U.S.C. § 215(a)(3), prohibits certain employers from retaliating
against employees for conduct protected under the FLSA because
it advances the statute's regulatory enforcement purposes.  The
First Circuit has not to date drawn bright lines definitively
identifying the outer limits of temporal proximity — between an
employee's protected conduct and an employer's adverse
employment action — sufficient to support an inference of
retaliation.

The record submitted in connection with this renewed motion
for summary judgment can fairly be read to present the question
whether a time span of slightly more than three months between
the filing of an FLSA litigation complaint by an employee and
that employee's termination is sufficiently proximate to provide

the foundation for a retaliation case.  In light of
corroborating causal evidence found in the summary judgment
record before me, I conclude that a gap of just over three
months is sufficiently proximate to justify permitting the case
proceed to resolution by a factfinder.

## I. BACKGROUND

The Plaintiff employee brought this action against his
former employer and two of the employer's senior supervisors,
alleging in Count I, as a collective action,[1] violations of the

---

[1] The FLSA expressly authorizes an employee to sue "for and in
behalf of himself . . . and other employees similarly situated,"
29 U.S.C. § 216(b), which allows employee-plaintiffs "the
advantage of lower individual costs to vindicate rights by the
pooling of resources," *Hoffman-La Roche Inc.* v. *Sperling*, 493
U.S. 165, 170 (1989).  Conditional certification of the
plaintiffs as a collective action does not, by contrast to a
putative class certified under Federal Rule of Civil Procedure
23, produce a class with an independent legal status.  *See*
*Genesis Healthcare Corp.* v. *Symczyk*, 569 U.S. 66, 75 (2013).
Rather, "[t]he sole consequence of conditional certification is
the sending of court-approved written notice to employees, who
in turn become parties to a collective action only by filing
written consent with the court."  *Id.* (internal citation
omitted).

The following plaintiffs have consented to suit: Colin
Andrews [Dkt. No. 52], Tom Aguilar [Dkt. No. 49], Tanner Weimer
[Dkt. No. 29], Alexander Marchena [Dkt. No. 28], David
Bevilacqua [Dkt. No. 27], Michael Bingaman [Dkt. No. 26], Taylor
Ford [Dkt. No. 25], Sam Toller [Dkt. No. 24], Robert C. Mitchell
[Dkt. No. 23], Ricky Rogers [Dkt. No. 22], Matthew Hampson [Dkt.
No. 21], Donald Norton [Dkt. No. 20], Julian Pierce [Dkt. No.
19], Joseph Hrezo Jr. [Dkt. No. 18], John Gaines [Dkt. No. 17],
Ulises Arteaga [Dkt. No. 16], Steven Reece [Dkt. No. 15],
Michael Piasecki [Dkt. No. 14], Matthew Camper [Dkt. No. 13],
Lawrence Tolo [Dkt. No. 12], Joey Gaines [Dkt. No. 11], Erik
Ascher [Dkt. No. 10], Edward Schultz [Dkt. No. 9], David Hornik

wage and labor provisions of the FLSA, 29 U.S.C. § 207, and alleging in Count II, individually, employment retaliation, *id.* § 215(a)(3). Remaining before me[2] is the employer's renewed Motion [Dkt. No. 73] for Summary Judgment with respect to Count II, the employee's individual retaliation claim. I consider the summary judgment record compiled by the parties in the light most favorable to the employee, as the non-moving party. *See Ramírez-Lluveras* v. *Rivera-Merced*, 759 F.3d 10, 13 (1st Cir. 2014).

**A.   *Parties***

Defendant **IEP** designs, manufactures, and services explosion suppression systems. Defendant **Randy Davis** is the President of IEP. Defendant **Burke Desautels** is IEP's Vice-President of After-Market Engineering.

Plaintiff **Mark Shaffer** worked for IEP as a Field Service Engineer from October 2014 to May 2018.

**B.   *Factual Background***

1.   Field Service Engineer Operations at IEP

IEP employed Field Service Engineers to install and service explosion suppression systems at customer jobsites. IEP

---

[Dkt. No. 8], and Allan Peacock [Dkt. No. 7]. These twenty-six plaintiffs are Field Service Engineers at IEP.

[2] The parties report that Count I, the substantive wage-and-hour collective action claim, has been settled since the Defendants first moved for summary judgment on all counts. [Dkt. No. 63]. *See generally infra* note 15.

provided schedules instructing Field Engineers to travel to certain jobsites on specified dates to perform assigned work. Field Engineers were responsible for making their own travel arrangements but often booked their travel through Atlas Travel, a company provided by IEP.

Field Engineers were required to complete an inspection and then prepare a field service report certifying the inspection and noting the condition of the system. Field engineers were also required to discuss system discrepancies with the customer and to obtain the customer's signature on the report.[3]   IEP supervisors considered report accuracy when determining job performance.

### 2.   IEP's Timesheet Policy for Field Engineers

Since December 1, 2016, Field Engineers have reported their hours in a time sheet submitted weekly to a supervisor for review.[4]   The time sheet breaks down the hours worked into

---

[3] Mr. Shaffer contends that there is a genuine dispute of material fact over whether IEP Engineers were required to discuss any discrepancies in the explosion suppression system with customers and to have the customer sign the service report. However, this purported dispute is not evident in the record before me.  In his deposition testimony, Mr. Shaffer himself confirmed that both the discussion of discrepancies and the procurement of the customer's signature following that discussion are "requirement[s]."  *See* Deposition of Mark Shaffer ("Shaffer Depo.") at 101:3-22.

[4] Mr. Shaffer disputes whether supervisors approved time sheets submitted to them.  *See* Deposition of Ulises Arteaga at 91:13-92:6 [Dkt. No. 78, Ex. 3].  The dispute is not material to the motion at hand.

several categories: in-plant time; office/miscellaneous
(including administrative time); driving time; and flying and
airport wait time within certain hours of the day.

The parties dispute – and the record is unclear on this
issue – whether IEP discouraged Field Engineers from reporting
more than one hour of administrative time per day.  IEP points
to its Time Sheet Standard Operating Procedure ("SOP"), which
instructed Field Engineers "to accurately record their hours
worked through this system.  Honesty is expected at all times,"
and "[n]o employee or supervisor has the authority to deviate
from this SOP."[5]  [Dkt. No. 78, Ex. 15].

By contrast, Mr. Shaffer contends that Mr. Desautels sent a
written memorandum to Field Engineers instructing them that "if
[they] put down more than one hour of [administrative time],
then [they] would have to spend time with [their] supervisor and

---

[5] Mr. Shaffer contends that a material dispute exists over
whether the SOP was disseminated for the purpose of instructing
field service engineers to record their time accurately.  There
is evidence in the record that IEP Engineers felt pressured by
IEP managers to underreport their administrative time.  *See,
e.g.*, Deposition of Edward Schultz at 97:2-5 [Dkt. No. 78, Ex.
11] (testifying that his supervisor "told" him not to exceed an
hour per day on his time sheet); Deposition of Joey Gaines at
22:13-23:4 [Dkt. No. 78, Ex. 10] (testifying that Engineers
"were led to believe that . . . we had to put [certain] hours on
our time sheet administration wise" during conversations with
supervisors).  However, Mr. Shaffer fails to cite any evidence
in the record that the SOP itself was disseminated for any other
purpose than to give instruction on reporting hours.  I find
that the asserted dispute in this respect is not based in the
summary judgment record.

that [they] were considered not efficient enough." Deposition of Mark Shaffer ("Shaffer Depo") at 184:12–185:5 [Dkt. No. 78, Ex. 2] (discussing the memorandum from Mr. Desautels, which is otherwise not included in the record). And on at least one occasion, according to Mr. Desautels, Mike Dubois, an IEP field service manager, "crossed out" a Field Engineer's reported administrative time of 11.75 and replaced it with 2 hours of administrative time on the basis that "[he] didn't believe it was accurate . . . because it's a high amount of office time." Deposition of Burke Desautels at 135:6–13 [Dkt. No. 78, Ex. 9].

The record reflects contradictory instruction from IEP with respect to the reporting of administrative time. Three Field Engineers testified in the *Hall* litigation, a parallel lawsuit against IEP, to underreporting their administrative time on the basis that IEP discouraged them from reporting more than an hour of administrative time per day. *See* Deposition of Joey Gaines ("Joey Gaines Depo.") at 19:23–23:17 [Dkt. No. 78, Ex. 10]; Deposition of Edward Schultz ("Schultz Depo.") at 100:19–101:4 [Dkt. No. 78, Ex. 11]; Shaffer Depo. at 184:4–5. But Mr. Schultz, who has submitted a consent to suit in this litigation, also testified that, on at least one occasion, he was instructed by his supervisor, Matthew Hampson, who himself has filed a consent to suit here, not to underreport his administrative time

6

and to record the full amount of hours he worked.  *See* Schultz Depo. at 95:19-24.

Mr. Shaffer appears to be the only engineer who was ever issued a formal written reprimand for reporting too much administrative time.  While Joey Gaines testified that he underreported his administrative time because of "[f]ear from getting a phone call from my manager," he also noted that he has never actually been reprimanded for reporting more than one hour of administrative time per day.  *See* Joey Gaines Depo. at 19:23-23:17.  Similarly, Mr. Schultz testified that he was told that he would receive a call from his manager and have to do additional training if he reported more than an hour of administrative time per day, but he did not state that he had been told he would be otherwise reprimanded.  *See* Schultz Depo. at 97:2-4.

### 3.   Mr. Shaffer's Course of Employment and Ultimate Discharge from IEP

Mr. Shaffer began his employment with IEP as a Field Service Engineer on October 20, 2014.  On his first day, he raised concerns about overtime due Field Engineers with Brian Baillargeon, the Field Service Commercial Manager.  In the fall of 2014, he raised the issue with his then-supervisor, Mr. Schultz, and, separately, with Mr. Dubois, a Field Service Manager who reported directly to the Defendant, Mr. Desautels.

> a.  *Mr. Shaffer's Participation in the* Hall *FLSA Litigation Against IEP*

In April 2016, Will Hall, a former Field Service Engineer, sued IEP in this court for unpaid overtime.  *See* Complaint, ECF No. 1, *Hall* v. *IEP Techs. LLC*, No. 1:16-cv-10662-JCB (D. Mass. Apr. 5, 2016).  In his January 5, 2017 deposition in that action, Mr. Hall testified that he contacted the Department of Labor about potential FLSA violations at IEP because he "had been having some conversations with Mark Schaefer [sic] about overtime that was owed."  Mr. Hall remained the sole plaintiff throughout the *Hall* litigation where no separate consents to suit were filed, but Mr. Shaffer has asserted in this litigation that he was subpoenaed twice in the *Hall* litigation.  On February 27, 2017, he received a subpoena *duces tecum*.  On May 2, 2017, he received a subpoena for trial deposition testimony.

Mr. Shaffer responded to the records subpoena but the *Hall* litigation was resolved before he could give his anticipated deposition testimony.  On May 31, 2017, the *Hall* parties advised the court that a settlement was reached.  *See* Joint Statement, ECF No. 40, *Hall* v. *IEP Techs., LLC*, No. 1:16-cv-10662-JCB (May 31, 2017).  On August 8, 2017, the court accepted the parties' formal settlement agreement, which had been proffered under seal during in camera proceedings in June.  *See* Order, ECF No. 48,

*Hall* v. *IEP Techs., LLC*, No. 1:16-cv-10662-JCB (Aug. 8, 2017).[6]

Meanwhile, in early 2017, with the *Hall* litigation ongoing, IEP conducted a "time study" of the time spent by Engineers on administrative activities. Mr. Desautels has testified that "[i]t became apparent to management that [Mr.] Shaffer was spending far too much time on alleged administrative activities" because for some weeks his administrative time "far exceeded that of his counterparts." Mr. Shaffer thereafter began receiving weekly phone calls from his supervisor Ricky Rogers warning him about the issue and in some calls instructing him to provide additional documentation detailing the administrative activities he performed.

---

[6] The parties dispute whether Mr. Shaffer was the only IEP Engineer who received a subpoena *duces tecum* in the *Hall* case. IEP contends that at least five Field Service Engineers, other than Mr. Shaffer, were subpoenaed because its counsel received service copies of five identical subpoenas *duces tecum* addressed to the following Plaintiff-Field Engineers who have filed consents to suit in this case: Mr. Schultz, Joey Gaines, John Gaines, Lawrence Tolo, and Sam Toller. However, IEP concedes in its briefing that it does not know which of these five, if any, were actually served by Mr. Hall's counsel in that litigation. Mr. Shaffer presents declarations from all five stating that they, in fact, never received subpoenas. *See* Declaration of Lawrence Tolo ¶ 5 [Dkt. No. 78, Ex. 14]; Declaration of Sam Toller ¶ 5 [Dkt. No. 78, Ex. 14]; Declaration of Edward Schultz ¶ 5 [Dkt. No. 78, Ex. 14]; Declaration of Joey Gaines ¶ 5 [Dkt. No. 78, Ex. 14]; Declaration of John Gaines ¶ 5 [Dkt. No. 78, Ex. 14]. I find that the direct record of percipient witness testimony establishes that Plaintiffs Schultz, Joey Gaines, John Gaines, Tolo, and Toller did not receive subpoenas for records in the *Hall* litigation. Consequently, I decline to consider IEP's contention for lack of a basis in the actual summary judgment record.

Prior to March 2017, Mr. Shaffer had received only positive performance reviews.  He received his last good performance review in February 2017.  No date is given in the record for that performance review, which occurred in the same month, on the second to last day of which (on February 27, 2017), Mr. Shaffer contends he received the subpoena *duces tecum* in the *Hall* litigation.

> b.   *The Simultaneous Delivery of Three Written Warnings and Reprimands*

Mr. Shaffer contends that between February and June 2017, following his subpoenaed participation in the *Hall* litigation, IEP assigned him to more multi-man crews and to fewer jobs in Ohio.

On October 2, 2017, nearly two months after the formal settlement of the *Hall* litigation and more than seven months after IEP became aware in February 2017 that Mr. Shaffer was being called to provide deposition testimony for that litigation, Mr. Shaffer emailed his supervisor, Ricky Rogers, a memorandum entitled, "The Elephant in the Room."  In the memorandum, he expressed concern that he was "being pursued and persecuted and bullied and pressured" due to his involvement in the *Hall* litigation.  See Shaffer Depo. at 274:23–275:16 (discussing contents of the Elephant in the Room memorandum, which is not otherwise included in the record).  Nine days

later, on October 11, 2017, IEP delivered Mr. Shaffer three
written warnings.  Although delivered on October 11, all of the
warnings bore earlier dates.

In the collection delivered October 11, 2017, the written
warning dated September 29, 2017, addressed Mr. Shaffer's
submission of administrative hours that exceeded those reported
by other Engineers.  The reprimand also criticized Mr. Shaffer's
submission of "excessive detail" with respect to the tasks
completed during his billed hours.  The record reflects that Mr.
Shaffer was the only Engineer ever warned in writing about
submitting excessive administrative time.

The September 29 warning also addressed Mr. Shaffer's
travel delay in getting to a customer's emergency service call.
The parties dispute the facts underlying this portion of the
warning, which revolves around potential miscommunications among
Atlas Travel, IEP, and Mr. Shaffer.  On that day, Mr. Dubois
instructed Mr. Shaffer to travel directly from Dayton to Roanoke
to address a customer's emergency service call.  According to
Mr. Desautels, Mr. Dubois had information – either from Atlas
Travel or from his own research, the record is not clear on this
matter – that a direct flight existed between Dayton and
Roanoke.  According to Mr. Shaffer, Atlas Travel stated that no
direct flight existed from any of the surrounding airports in
Ohio and that he would have to drive to the airport in Detroit

and take a connecting flight.  He did as Atlas recommended and drove to the airport in Detroit.  As a consequence, Mr. Shaffer arrived a day later than instructed by his supervisor.  The September 29 reprimand concluded that Mr. Shaffer had chosen not to follow his supervisor's instructions to take a direct flight to the customer site and that this failure constituted insubordination.

The second written warning, dated October 2 but delivered on October 11, concerned Mr. Shaffer's travel delay in getting to a customer site when he decided to return to his hotel to shower rather than join his coworkers in traveling directly to the next customer site.

The third written warning, delivered on October 11 but also dated October 2, concerned Mr. Shaffer's failure to travel to an emergency customer call on October 1, 2017.  On that day at 6:54 PM, Mr. Shaffer was in church without his phone when Bill Merriam, a Senior Design Engineer, called him to arrange travel on the first flight the next morning to a customer site.  After Mr. Shaffer didn't answer his phone, Mr. Merriam called Mr. Shaffer's home phone and spoke with Mr. Shaffer's wife who stated that he would be at church until after midnight.  Mr. Merriam told her that Mr. Shaffer would still need to take the first flight out of Ohio the next morning.  At 1:52 AM, on October 2, Mr. Shaffer emailed Mr. Rogers and Mr. Dubois that he

would be unable to make the first morning flight because he was too tired.  IEP was required to send a different Engineer, which resulted in a delay in service to the customer.  This Third Written Warning advised that discharge was the next step in the disciplinary process.  *Id.*[7]

    c.  *Termination*

Mr. Shaffer's termination occurred on April 18, 2018, more than seven months after discharge was threatened by the delivery on October 11, 2017, of the second October 2, 2017 warning and reprimand. On that day, Mr. Shaffer inspected the explosion suppression system of customer Innovative Fabrications and took note of a wiring discrepancy.  Nevertheless, in his field service report, Mr. Shaffer certified that the explosion suppression system was in proper working condition and he secured the signature of the customer's representative on that report.  On that day, after leaving the customer site, Mr. Shaffer sent an email to Defendant Dubois and Plaintiffs Rogers

---

[7] Another disciplinary incident occurred in late October 2017. Mr. Shaffer was at a hotel doing his laundry when he received an emergency call from IEP Supervisor Steve Haskell, directing him to go to a customer site.  Mr. Shaffer checked out and started driving within twenty minutes of the call.  After about two hours of driving, Mr. Dubois called to inform Mr. Shaffer that he was suspended and would be terminated pending further investigation for allegedly refusing to answer the emergency call.  Mr. Shaffer explained the circumstances of the story to Mr. Dubois and he was not disciplined on the basis of this warning.

and Arteaga discussing the wiring discrepancy.[8]  *See* Email from Mark Shaffer to Michael Dubois, Ricky Rogers, and Ulises Arteaga ("Wiring Discrepancy Email") (Apr. 18, 2018, 12:40 PM) [Dkt. No. 75, Ex. 16].

According to that email, Mr. Shaffer had completed inspections at the Innovative Fabrications facility twice before and on each of those occasions, he had taken note of the same wiring discrepancy that affected how the customer's explosion suppression system tested fire for alarm.  *Id.*[9]  According to the

---

[8] The only description of this wiring discrepancy appears in this April 18, 2018 email that Mr. Shaffer sent to the Defendant Mr. Dubois and to Plaintiffs Rogers and Arteaga following his inspection of the Innovative Fabrications site.  *See* Email from Mark Shaffer to Michael Dubois, Ricky Rogers, and Ulises Arteaga ("Wiring Discrepancy Email") (Apr. 18, 2018, 12:40 PM) [Dkt. No. 75, Ex. 16].  IEP states that it terminated Mr. Shaffer because of the April 18, 2018 inspection and the Wiring Discrepancy Email.  *See* Letter from Burke Desautels to Mark Shaffer (May 8, 2018) ("May 8, 2018 Termination Letter") [Dkt. No. 75, Ex. 17]. In the email, Mr. Shaffer describes the issue with the customer's explosion suppression system as follows:

> The system consists of a sole EX200 control panel, two pairs of static detectors installed on opposite corners.  All four static detectors test fire back to the EX200 control panel correctly for fault conditions.  However, the specific pair mounted on each dust collector does not test fire for alarm. Yet, the two ***front*** static detectors on the separate dust collectors test fire for alarm conditions.  Also, the two ***rear*** static detectors on the separate dust collectors test fire for alarm conditions.

Wiring Discrepancy Email (emphasis in original).

[9] This customer plant changed ownership during the relevant time period at issue.  From at least October 16, 2015 through January 2017, the plant was operated under a different name, which is not provided in the record.  *See* Wiring Discrepancy Email.  From January 2017 to January 2018, the plant was closed.  *Id.*  In

email, Mr. Shaffer had first noted the wiring discrepancy on
October 16, 2015. *Id.* On that day, Mr. Shaffer called Mr.
Baillargeon, IEP's Field Service Commercial Manager, and left a
message detailing the discrepancy. *Id.* Apparently, Mr.
Baillargeon returned the call on the same day at 1:00 PM and
left a voice message "commending [Mr. Shaffer] for a nice
catch." *Id.* According to the April 18, 2018 email, Mr.
Baillargeon called again on October 16, 2015, at 1:04 PM and
left another voice message explaining the source of the
technical issue[10] but, as relevant here, concluding that Mr.
Shaffer should simply "mark the prints up." *Id.* Mr. Shaffer
then spoke to an IEP design engineer (whose name is omitted from
the April 18, 2018 email)[11] who further clarified that, "because

---

January 2018, the plant reopened under the name Innovative
Fabrications. *Id.* For clarity, I will refer to the plant as
Innovative Fabrications throughout because that is how Mr.
Shaffer's April 18, 2018 email – the primary source of
information about this relevant chronology of inspections
preceding his termination on May 8, 2018 – refers to the
customer site. *Id.*

[10] Specifically, according to the April 18, 2018 email, Mr.
Baillargeon explained to Mr. Shaffer "that page one of the
prints [of the design of the customer's explosion suppression
system] appeared correct and that page two shows an error with
[static] detectors 1 and 1A on separate dust collectors and to
mark the prints up." *See* Wiring Discrepancy Email.

[11] In Mr. Shaffer's filings in this case, he adds two facts
relating to the October 16, 2015 inspection and cites to a
portion of his deposition testimony as the evidentiary basis in
the summary judgment record. *See* Pl.'s Response to Defs.'
Statement of Undisputed Material Facts ¶ 109 (citing Shaffer
Depo. 280:13-289:3). First, he identifies the IEP design
engineer as Mark Hughes. *Id.* Second, he asserts that Mr.

the dust collectors share a common duct work, it would be fine."
*Id.*

In the two days following his inspection of the Innovative
Fabrications site, Mr. Shaffer marked the prints for the
customer's explosion suppression system according to the
instructions of Mr. Baillargeon, scanned the prints, and sent
the scans to IEP's management office alongside a drawing that he
had made of the wiring discrepancy.  *Id.* (describing attached
files dated October 17, 2015, at 7:19 PM and October 18, 2015,
at 8:13 PM).

Mr. Shaffer inspected the Innovative Fabrications system
again on December 7, 2016.  *Id.*  According to the April 18, 2018
email, Mr. Shaffer discovered the same wiring discrepancy during
his second inspection.  *Id.*  He looked at the prints for the
explosion suppression system and noted that they "had not been
changed yet."  *Id.*  According to the email, he called IEP
management and again "was told [that] because the separate
vessels share a common duct work, it would be fine."  *Id.*  He
was also told that the customer was "closing their doors
indefinitely" in January 2017, so "it would be OK."  *Id.*  The

---

Baillargeon told him the discrepancy was just "a labeling
problem."  *Id.*  However, the record does not actually include
the relevant cited portions of Mr. Shaffer's deposition
testimony.  Accordingly, I cannot find that these specific facts
have been established by the record actually before me.

April 18, 2018 email does not identify who Mr. Shaffer spoke to
in this December 7, 2016 call to IEP management.

Mr. Shaffer's third and final inspection of the Innovative
Fabrications explosion suppression system on April 18, 2018,
precipitated his termination on May 8, 2018.  The Wiring
Discrepancy Email explains that, although Innovative
Fabrications did shut down in January 2017, it reopened in
January 2018, which required an inspection of the customer's
explosion suppression system.  *Id.*  As discussed, Mr. Shaffer
completed the inspection, certified in the service report that
the system was in proper working condition, and secured the
signature of the customer's representative on that report.  *Id.*
However, according to the Wiring Discrepancy Email, Mr. Shaffer,
after leaving the customer's site, "kept thinking about the
strange way the [static] detectors were test firing" and called
the IEP office to relate his concerns.  *Id.*  He spoke with
Sawyer Hamlin, who told him that "although the detectors test
fired for alarm conditions according to the drawings [made by
Mr. Shaffer on his first visit in October 2016], the prints [of
the explosion suppression system], in fact, were incorrect and
the wiring needed to be changed."  *Id.*  Mr. Shaffer agreed,
turned his car around and headed back to the customer site.  He
told the customer he needed to reinspect the system.  He tried
to remedy the issue, but was unable to do so.

17

That evening, Mr. Shaffer sent the April 18, 2018 Wiring
Discrepancy Email to Mr. Dubois, Mr. Rogers, and Mr. Arteaga.
After recounting the chronology stated above with respect to Mr.
Shaffer's prior two inspections of the Innovative Fabrications
system, he explained in detail why he had been unable to fix the
wiring discrepancy that afternoon.[12]  He concluded that, "[i]n
order to correct this scenario, new wiring may have to be
pulled," and that "[n]one of this [information about the wiring
discrepancy] has been conveyed to the customer.  They think we
may return very soon with different labels, prints, etc, to
correct what they see as a small overlook."  *Id.*  Mr. Shaffer
ended the email with his suggestion on how IEP could "get back
into the plant, correct the wiring, and save face."  *Id.*

---

[12] Specifically, Mr. Shaffer explained:
> Unfortunately, there is no main junction panel, only a
> sole 3/4" threaded ridgid [sic] conduit running from the
> EX200 controller to the first vessel, then to the second
> vessel, then back to the first vessel once again. This
> solid home run has several threaded LB fittings and Tees.
> Please see my attached drawing to clearly show more
> detail.  Also, the sole conduit contains 6 separate
> insulated conductors, which are listed as:
> - Two conductors for the actuation circuit, terminals 44-45.
> - Two conductors for the detector 1 circuit, terminals 16-19.
> - Two conductors for the detector 2 circuit, terminals 20-23.
> The customer has absolutely no electricians, electrical
> department, wire, or equipment.  This is due to the
> building being stripped of everything upon closing its
> doors over a year ago.

Wiring Discrepancy Email.

It was for the purported offense of certifying an
incomplete field service report on April 18, 2018 – as distantly
foreshadowed in the second October 2, 2017 warning delivered on
October 11, 2017 – that IEP says it discharged Mr. Shaffer on
May 8, 2018.  The termination letter states:

> To summarize, on April 18, 2018, you completed your
> field service report certifying that the test fire
> capabilities of the Innovative Fabrications system
> were in "proper working condition."  Then, you
> subsequently sent an email to Mike Dubois, Ricky
> Rogers, and Ulises Arteaga at roughly the same time
> stating that you found a "wiring discrepancy" in the
> system and indicated that two of the detectors did not
> properly test fire.
>
> You should have indicated on the field service report
> that further work was necessary and provided these
> details on page 3 of the report.  You should have
> further explained to the customer your concerns before
> leaving the job site.  Your failure to take these
> steps led the customer to believe that its system was
> fine when you apparently did not believe that to be
> the case.

*See* May 8, 2018 Termination Letter.

According to Mr. Desautels, the system was reinspected by
Mr. Hampson at some point after April 18, 2018.  *See* Desautels
Depo. 209:4-9.  Mr. Hampson reported, as Mr. Shaffer had, that
the client's explosion suppression system was in proper working
condition.  *Id.*  And in its briefing, IEP now concedes that "the
customer's system was functional" during the April 18, 2018
inspection.  Def.'s Reply Memorandum to Pl.'s Opp. to Renewed
Mot. for Partial Summary Judgment 5 [Dkt. No. 81].

19

Nevertheless, the parties dispute the point at which Mr. Shaffer understood that "a wiring discrepancy" was irrelevant to the proper functioning of the explosion suppression system. IEP contends that it was an "after-the-fact discovery," *id.*, but Mr. Shaffer states that he had verbally discussed the discrepancy with IEP management in his two prior inspections of the customer's system and was told the system "would be fine" by other IEP personnel.[13]

## C.   *Procedural History*

Mr. Shaffer filed his own litigation on January 26, 2018 against IEP, Mr. Davis, and Mr. Desautels alleging in Count I that IEP owed him unpaid overtime under the FLSA essentially covering the timeframe from January 26, 2015 through January 26, 2018 and alleging in Count II a separate count of retaliation under the FLSA against all Defendants.

On April 2, 2018, the Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(6). I found that motion

---

[13] Confusingly, in the same breath that IEP contends that its realization that the wiring discrepancy did not affect the proper functioning of the explosion suppression system, it also states that IEP "was correct in its assessment two years earlier" – presumably referencing Mr. Shaffer's first inspection on October 16, 2015, when Mr. Baillargeon informed Mr. Shaffer that, despite the noted wiring discrepancy, the customer's system "would be fine." Def.'s Reply Memorandum to Pl.'s Opp. to Renewed Mot. for Partial Summary Judgment 5 [Dkt. No. 81]. IEP's assertion that it "was correct in its assessment two years earlier" thus appears to support the proposition that Mr. Shaffer alerted IEP to the wiring discrepancy in 2016.

moot after Mr. Shaffer filed an Amended Complaint on May 15, 2018 — a week after his termination on May 8, 2018.  Discovery proceeded as to the Amended Complaint in accordance with a scheduling order entered May 24, 2018.

Eight months later, on March 15, 2019, the parties jointly moved to stay the case pending mediation, and I granted that motion.  During the period of the stay, the scheduling order was modified and extended.

When mediation proved unsuccessful, the stay was lifted and the parties initiated summary judgment practice.  After a hearing on February 24, 2021, I denied the cross-motions without prejudice.[14]  At the end of April, the parties gave notice that they had settled the FLSA claim (Count I).[15]  The Defendants[16] had

_____

[14] On June 9, 2021, I ordered [Dkt. No. 82] Mr. Shaffer to submit an amended complaint by June 30, 2021, addressing concerns raised at the February 24, 2021 hearing.  Mr. Shaffer has yet to make that submission, so I proceed to consider the pending motion based on the summary judgment record as it stands.
[15] The parties reported on April 30, 2021, that they were in the process of preparing a Joint Motion to Approve Settlement concerning the claims in Count I, [Dkt. No. 74 at 2 n.1], but they have yet to do so.
[16] As a formal matter, the motion for summary judgment before me regarding Count II is presented only by Defendant IEP and not by the individual Defendants, who are represented by the same counsel.  Presumably this presentation of the motion as being brought only by IEP is framed in that way because the individual Defendants cannot be held liable if IEP itself is not held liable.  In any event, in this Memorandum, I will reference contentions regarding summary judgment as to Count II as being made by the Defendants in the plural.  My disposition of the motion will be applicable to all three Defendants.

also moved for summary judgment as to the sole remaining claim against all Defendants for retaliation under the FLSA (Count II). It is the motion as to that remaining claim that I take up here.

## II. SUMMARY JUDGMENT AS TO RETALIATION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine" dispute is one as to which, based on the record, "a reasonable [factfinder] could resolve the point in the favor of the non-moving party." *Sanchez* v. *Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996) (quoting *Rivera-Muriente* v. *Agosto-Alicea*, 959 F.2d 349, 352 (1st Cir. 1992)). A "material" fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Id*. (quoting *One Nat'l Bank* v. *Antonellis*, 80 F.3d 606, 608 (1st Cir. 1996)). If further "inquiry into the facts is . . . desirable to clarify the application of the law," summary judgment is not appropriate. *Mandel* v. *Bos. Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006) (quoting *Stevens* v. *Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950)).

### A.   *Retaliation Under the FLSA*

Defendants have moved, *see supra* notes 2, 15 & 16, for summary judgment against Mr. Shaffer's individual claim of retaliation in Count II on the basis that Mr. Shaffer has failed

to establish (1) changes to his assignments and certain warnings and reprimands are adverse employment actions, and (2) the requisite causal link between any adverse employment action presented in the summary judgment record and his FLSA protected activity.

The FLSA prohibits employers within its scope from retaliating against an employee who has "filed any complaint or instituted or caused to be instituted any proceeding under or related to" the FLSA, "or has testified or is about to testify in any such proceeding."  29 U.S.C. § 215(a)(3).[17]

_____

[17] The FLSA prohibits retaliation by "any person" and defines "person" to mean "an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons."  29 U.S.C. § 203(a).  Thus, employer liability for retaliation is contemplated by the statute.  However, courts have also recognized that managers may be subject to individual liability based on their responsibilities and authority at the company.  See, *e.g.*, *Moore* v. *Appliance Direct, Inc.*, 708 F.3d 1233, 1237 (11th Cir. 2013) (upholding personal liability for retaliation claim where individual is considered "employer"); *Pineda* v. *Skinner Servs., Inc.*, No. 16-12217-FDS, 2020 WL 5775160, at *24 (D. Mass. Sept. 28, 2020) (allowing anti-retaliation claims under the FLSA to proceed against individual defendants).

Here, Mr. Shaffer brought his claim of retaliation in violation of the FLSA against IEP as well as against Mr. Davis and Mr. Desautels in their capacities as President and a Manager of IEP, respectively.  *See* Amended Complaint ¶¶ 67 & 68 (Count II) [Dkt. No. 43].  Only IEP has formally moved for summary judgment on Count II.  *See* Renewed Motion for Summary Judgment [Dkt. No. 73].  However, for the purpose of this motion for summary judgment, the Defendants' defenses against liability under the anti-retaliation provision will rise or fall together. *See supra* note 16.  Accordingly, I refer to the Defendants in the plural throughout this Memorandum.

Where, as here, the plaintiff does not allege direct
evidence of unlawful retaliatory animus, his claim is analyzed
under the three-step burden-shifting analysis articulated in
*McDonnell Douglas Corporation* v. *Green*, 411 U.S. 792 (1973).[18]
Under the *McDonnell* approach, a plaintiff must first set forth a
prima facie case supporting an inference of retaliation.  *Id.* at
802.  Second, the burden of production shifts to the employer to
articulate a legitimate, nonretaliatory reason for the
termination.  *Id.*  Third, "if the employer produces evidence of
a legitimate nonretaliatory reason, the plaintiff must assume
the further burden of showing that the proffered reason is a
pretext calculated to mask retaliation."  *Harrington* v.
*Aggregate Indus.-Ne. Region, Inc.*, 668 F.3d 25, 31 (1st Cir.
2012).

While "[t]his burden-shifting framework is a useful
screening device in the summary judgment milieu, . . . courts
typically put it aside once the third step is reached," and

---

[18] The parties do not dispute that the framework articulated by
the Supreme Court in *McDonnell Douglas Corporation* v. *Green*, 411
U.S. 792 (1973), for the Title VII context applies as well to a
retaliation claim in the FLSA context.  In this connection, I
note that First Circuit caselaw "regard[s] Title VII, ADEA,
ERISA, and FLSA as standing *in pari passu* and endorse[s] the
practice of treating judicial precedents interpreting one such
statute as instructive in decisions involving another."
*Serapion* v. *Martinez*, 119 F.3d 982, 985 (1st Cir. 1997).  *Cf.*
*Harrington* v. *Aggregate Indus.-Ne. Region, Inc.*, 668 F.3d 25, 31
(1st Cir. 2012) (holding that the *McDonnell* framework applies in
retaliation claims under the False Claims Act).

"look[] to the record as a whole to determine whether there is sufficient evidence of 'pretext and retaliatory animus' to make out a [triable] question." *Id.* (quoting *Mesnick* v. *Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991)).  The question is "not whether a reasonable [factfinder] could find that [the employer] would have [taken adverse employment action against the employee] even in the absence of retaliatory intent.  Rather, the question pertinent to . . . summary judgment is whether no reasonable [factfinder] could find otherwise." *Travers* v. *Flight Servs. & Sys., Inc.*, 737 F.3d 144, 148 (1st Cir. 2013).

## B.   *Discussion*

The Amended Complaint alleges that IEP retaliated against Mr. Shaffer by: (1) assigning him to fewer jobs in his home state of Ohio and, separately, to more multi-person crews, (2) giving him three written disciplinary warnings, and, although not expressly alleged in the Amended Complaint,[19] (3) terminating him on a pretextual basis.

---

[19] Inexplicably, although Mr. Shaffer's Amended Complaint was filed after his termination, it does not expressly allege his termination as an adverse employment action [*See* Dkt. No. 43 ¶ 67].  Nevertheless, the discovery proceeded thereafter to address the grounds for termination and the parties in their briefing make argument regarding whether the asserted grounds were pretextual.  Under the circumstances, although Plaintiff's counsel has not been timely in response to my directive to submit a conforming second amended complaint, I will address termination as an adverse employment action.  However, to encourage Plaintiff's counsel at last to submit appropriate pleadings, I will, as will appear below, deny the Defendants'

Under the first step of *McDonnell Douglas*, a prima facie case of retaliation under the FLSA requires the plaintiff to show that "(1) [he] engaged in a statutorily protected activity, and (2) his employer thereafter subjected him to an adverse employment action (3) as a reprisal for having engaged in protected activity." *Claudio-Gotay* v. *Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102 (1st Cir. 2004). The parties do not dispute that Mr. Shaffer's receipt of a subpoena *duces tecum* in the *Hall* FLSA litigation on February 27, 2017, and his prospective testimony in the *Hall* litigation in May 2017, as well as the filing of his own FLSA suit against IEP on January 26, 2018, could each constitute protected activity. *See* 29 U.S.C. § 215(a)(3). The parties do dispute — at least partially — whether either or both the second prong (adverse employment action) and/or the third prong (motivated by reprisal) of the *McDonnell Douglas* framework is supported by the record. I will address the forms of retaliation implicated by Mr. Shaffer's pleading and the record before me before determining whether any viable claims of adverse employment action may be said to have been motivated by the intent to engage in reprisal for protected activity.

---

motion for summary judgment without prejudice to reconsideration upon Defendants' motion of resubmittal and likely consequent allowance if no appropriate conforming pleading is filed by Plaintiff's counsel on or before August 31, 2021.

1. <u>Adverse Employment Action</u>

   *a.  Changes to Mr. Shaffer's Job Assignments*

Mr. Shaffer contends that, after participating in the *Hall* litigation, he began to receive (i) fewer assignments in his home-state of Ohio and (ii) more group assignments.  Both contentions fail to constitute adverse employment actions.

   i.   Fewer Assignments in Ohio

Mr. Shaffer's claim that he was assigned to fewer jobs in Ohio fails because the record demonstrates that his Ohio assignments actually increased during the relevant period.  He worked 52 jobs in Ohio in 2015.  He worked 71 Ohio assignments in 2016, and 78 such jobs in 2017.  Mr. Shaffer has failed as a matter of law to establish the asserted adverse employment action as to the Ohio assignment contention.

   ii.  More Group Assignments

The claim that Mr. Shaffer was assigned to more multi-person assignments fails because the record does not establish that these assignments were adverse employment actions.

While adverse employment actions are not necessarily limited to such ultimate adversities as terminations, they must also involve more than "[m]inor disruptions in the workplace, including 'petty slights, minor annoyances, and simple lack of good manners.'" *Morales-Vallellanes* v. *Potter*, 605 F.3d 27, 36 (1st Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co.* v.

27

*White*, 548 U.S. 53, 68 (2006)).  The standard for judging harm
is objective.  *Id.*  Thus, to state an adverse employment action,
a plaintiff must typically establish that the employer:

> either (1) [took] something of consequence from the
> employee, say, by discharging or demoting [him],
> reducing [his] salary, or divesting [him] of significant
> responsibilities, or (2) with[eld] from the employee an
> accouterment of the employment relationship, say, by
> failing to follow a customary practice of considering
> [him] for promotion after a particular period of
> service.

*Blackie* v. *Maine*, 75 F.3d 716, 725 (1st Cir. 1996) (internal
citations omitted).

Reassignments of job duties are "not automatically
actionable."  *Billings* v. *Town of Grafton*, 515 F.3d 39, 53 (1st
Cir. 2008) (quoting *Burlington N.*, 548 U.S. at 71).  Whether a
reassignment constitutes an adverse employment action depends
upon all of the circumstances viewed from "the perspective of a
reasonable person in the plaintiff's position."  *Id.* (quoting
*Burlington N.*, 548 U.S. at 71).  Thus, transferring an employee
to a less prestigious position or a role requiring "far less
skill and significantly harsher working conditions" may
constitute a materially adverse employment action.  *Rodriguez-
Vives* v. *P.R. Firefighters Corps. of P.R.*, 743 F.3d 278, 286
(1st Cir. 2014) (quoting *Tart* v. *Ill. Power Co.*, 366 F.3d 461,
473 (7th Cir. 2004)).

In a post-hearing submission I solicited, I permitted Mr. Shaffer to direct me specifically to record support for his contention that group assignments were adverse employment actions.  Mr. Shaffer submitted that multi-person jobs were less desirable because, when he worked these assignments, he would often agree to prepare the field service reports, which took up to five hours of administrative time to complete.

However, Mr. Shaffer does not allege that the preparation of a field service report was a requirement of his *assignment* to multi-person jobs.  Rather, he admits that he "was asked, never instructed or told" by IEP to complete these reports and that he "was never put on any type of pressure to do them."  The record supports that he could simply have refused to perform the reports at any time without repercussion.  That Mr. Shaffer often "ended up" performing these reports merely because "he never refused the request" does not transform the assignment itself into an adverse employment action.  Indeed, he does not allege that he expressed any preference at any time to IEP to be assigned to single-person jobs.

In other words, even if the assignment to group jobs strikes Mr. Shaffer now or even struck him then as *subjectively* undesirable, he fails to allege that multi-person assignments were *objectively* undesirable such that the assignments could "well dissuade a reasonable worker from making or supporting a

charge of discrimination." *Billings*, 515 F.3d at 54 (quoting *Burlington N.*, 548 U.S. at 57). "[A]n employee's displeasure at a personnel action cannot, standing alone, render it materially adverse." *Billings*, 515 F.3d at 53. Workplaces are "rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." *Morales-Vallellanes*, 605 F.3d at 35 (quoting *Marrero* v. *Goya of P.R., Inc.*, 304 F.3d 7, 23 (1st Cir. 2002)).

Mr. Shaffer has failed to show that he had a right to single-person assignments, that single-person assignments are objectively more desirable, or that his shift to more multi-person assignments failed to follow any customary practices. His multi-person assignment contention fails as a matter of law to establish an objectively adverse employment action sufficient to support a retaliation claim under the FLSA.

> b. *The Simultaneous Delivery of Three Written Warnings and Reprimands on October 11, 2017*

The First Circuit has recognized that a reprimand may constitute an adverse action where it carries tangible employment consequences, such as termination, suspension, or a change in compensation and other benefits. *See Billings*, 515 F.3d at 54-55. However, when, as here, a formal reprimand does

not, itself, execute tangible consequences, but is "merely directed at correcting some workplace behavior that management perceive[s] as needing correction," the reprimand generally does not constitute an adverse employment action. *Bhatti* v. *Trs. of Bos. Univ.*, 659 F.3d 64, 73 (1st Cir. 2011).  One exception to this general rule appears to exist where the reprimand itself directly relates to the protected conduct at issue.

In *Billings*, the First Circuit considered a retaliation claim under Title VII and held that "a formal investigation and reprimand[,] including a threat of 'further, more serious discipline,'" constituted an adverse employment action where it was likely to have the effect of persuading the employee to "choose not to proceed with the litigation in the first place." 515 F.3d at 54–55.  The court found that the written reprimand at issue there was likely to have that effect because it was justified by the supervisor through references to the employee's pending discrimination suit.  The court emphasized that the employer's justification for the reprimand was that the employee was "being insufficiently careful '[i]n light of [her] pending litigation.'"  *Id.* at 55 (alterations in original).  The court explained that a jury could reasonably find that an employee who received discipline on a basis related to her pending discrimination suit against her employer "knows that, [by filing a complaint of employment discrimination], she risks a formal

31

investigation and reprimand . . . [and] might well choose not to proceed with the litigation in the first place." *Id.* at 54-55.[20]

By contrast, the reprimands at issue here were prototypical criticisms of an employee's specific work.  Whether or not they were justified based on Mr. Shaffer's performance, they did not have the critical characteristic of the reprimand in *Billings* that directly implicated the employee's pursuit of statutorily protected activity and therefore could reasonably support an inference of retaliation.

The reprimands at issue here are akin to the "tamer beasts" described in *Bhatti*.  659 F.3d at 73.  There, the reprimands also warned of further disciplinary actions, up to and including termination, as the plaintiff contended to the Court of Appeals. *See* Brief for Plaintiff-Appellant, *Bhatti* v. *Trs. of Bos. Univ.*, 659 F.3d 64 (1st Cir. 2011) (No. 10-2342), 2011 WL 970412, at *38.  And there, the Court of Appeals agreed with the plaintiff

---

[20] On appeal in *Billings*, the First Circuit also observed that the formal reprimand was uniquely severe with respect to usual disciplinary processes because the supervisor was reacting to the presence of the pending FLSA litigation against him. *See generally Billings* v. *Town of Grafton*, 515 F.3d 39 (1st Cir. 2008).  The First Circuit, echoing an observation by the district court, itself observed that the supervisor conceded that, "in the absence of the discrimination charge [filed by the plaintiff-employee against him], he would have handled the incident differently," either by leaving the issue unaddressed or addressing it in a less formal manner. *Id.* at 42; *see also Billings* v. *Town of Grafton*, 441 F. Supp. 2d 227, 237 (D. Mass. 2006), *overruled on other grounds* 515 F.3d 39 (1st Cir. 2008).

that the reprimands were "undeserved." *Bhatti*, 659 F.3d at 73. However, the court also emphasized that the plaintiff's "working conditions were never altered" in negative aspects. *Id.* Because, as a matter of law, "a criticism that carries with it no consequences is not materially adverse and therefore not actionable," the court found that the reprimands did not suffice to form the foundation of a retaliation claim. *Id.*

Similarly here, Mr. Shaffer provides no evidence that any of the three written reprimands he received on October 11, 2017, "'materially change[d] the conditions' of [his] employment and thus [provides] no reason to think that [these reprimands] alone qualified as an 'adverse employment action.'" *Micheo-Acevedo* v. *Stericycle of P.R., Inc.*, 897 F.3d 360, 365 n.3 (1st Cir. 2018) (alterations in original) (quoting *Gu* v. *Bos. Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002)). Mr. Shaffer cannot allege that the reprimands affected his participation in the *Hall* suit, because the parties in that litigation had announced their agreement to settle the suit five months earlier in May 2017. Nor does Mr. Shaffer allege that the reprimands dissuaded him from pursuing his own FLSA litigation against IEP, which he filed approximately three months later in January 2018. More importantly, Mr. Shaffer does not allege that the reprimands had

any tangible effect on his work conditions until his termination in May 2018 – seven months later.[21]

I find that the three formal reprimands — individually or together — cannot, as a matter of law, be found to constitute a materially adverse employment action because they carried no consequences to Mr. Shaffer's employment.

        *c.   Termination on May 8, 2018*

By contrast, there can be no dispute that termination is the quintessential adverse employment act.  *See* 29 U.S.C. § 215(a)(3) (unlawful "to discharge . . . any employee because such employee has filed any complaint" under the FLSA).  Thus, causation becomes the next step to consider in determining whether Mr. Shaffer has established on the summary judgment record a prima facie case of retaliation.  In other words, to survive summary judgment, Mr. Shaffer must demonstrate a genuine issue of material fact as to whether retaliation was IEP's real intent underlying his termination.  He undertakes to do so in

---

[21] In light of the lack of concrete adverse actions in the seven months separating the formal written reprimands delivered on October 11, 2017 and Mr. Shaffer's ultimate termination in May 2018, I find as a matter of law that the disciplinary events are too attenuated to consider the latter a causal consequence of the former.  Even where a reprimand warns of future disciplinary actions, it cannot constitute adverse employment action when more than seven months of employment subsequently pass without repercussion.  That said, I do consider the formal written reprimands as evidentiary in my consideration of the question of pretext in connection with Mr. Shaffer's ultimate termination.

reliance upon the temporal proximity between his termination and
the protected activity of filing this FLSA action.

    2.    Motivated by Reprisal

    Circumstantial evidence, such as temporal proximity,
"alone[,] can suffice to 'meet the relatively light burden of
establishing a prima facie case of retaliation.'"   *DeCaire* v.
*Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) (quoting *Mariani-Colón*
v. *Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 224
(1st Cir. 2007)).  But "[t]he cases that accept mere temporal
proximity between an employer's knowledge of protected activity
and an adverse employment action as sufficient evidence of
causality to establish a prima facie case uniformly hold that
the temporal proximity must be 'very close.'"   *Clark Cty. Sch.
Dist.* v. *Breeden*, 532 U.S. 268, 274 (2001) (per curiam) (quoting
*O'Neal* v. *Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir.
2001)).

    Thus, the Supreme Court in *Breeden* made clear that twenty
months, considered alone, is too long a time period to support
an inference of retaliation under the FLSA.  532 U.S. at 274.
For its part, the First Circuit further tightened this stand-
alone outer limit when it held that "a gap of several months
cannot alone ground an inference of a causal connection between
a complaint and an allegedly retaliatory action."   *Ahern* v.

*Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010) (holding a six-month gap too attenuated without corroborative evidence of causation).

> a.   *Temporal Proximity Between the* Hall *Litigation and Termination*

Setting aside the October 11, 2017 warnings, which I have determined are not adverse employment actions in and of themselves,[22] the parties set forth different milestones with respect to Mr. Shaffer's involvement in the *Hall* litigation from which to measure temporal proximity supporting an inference of retaliation.

The shortest timeline is proposed by Mr. Shaffer, who contends that I should look to the settlement of the *Hall* litigation on August 7, 2017.[23]   As an initial matter, it is not

---

[22] For this reason, I do not consider Mr. Shaffer's contention that his prima facie case rests on the two months separating the final formal August 2017 settlement of the *Hall* litigation and the October 11, 2017 delivery of written formal warnings.   While a two-month time span would likely support an inference of retaliation and a prima facie case, *see Mariani-Colón* v. *Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 224 (1st Cir. 2007) (holding that temporal proximity of two months suffices to establish a prima facie case of retaliation), I have already determined, *see supra* note 21 and accompanying text, that the October 2017 reprimands are too attenuated from Mr. Shaffer's ultimate termination in May 2018 to infer that the former could be causative of the latter.   Thus, I look to the reprimands only as evidence of pretext and not as adverse employment actions in and of themselves.

[23] For its part, IEP sets forth a far more distant milestone that does not merit extended discussion.   It argues that the clock started when Mr. Shaffer began complaining to IEP management about potential FLSA violations within days of his hire in 2014.   Accepting this asserted span of nearly four years would put Mr. Shaffer's claim far outside the limits of retaliatory inference

clear that I should look to the district court's order adopting the parties' proposed settlement in August 2017, rather than to the parties' announcement of proposed settlement in May 2017. The First Circuit rejected a similar argument in *Abril-Rivera* v. *Johnson*, where it held that the dismissal of a class complaint by a decision of the U.S. Equal Employment Opportunity Commission "cannot be construed as protected activity on the part of the *plaintiffs*."  806 F.3d 599, 609 (1st Cir. 2015) (emphasis in original).  Rather, the court found that the last protected activity on the part of the plaintiffs for the purpose of measuring temporal proximity supporting an inference of retaliation was the filing of the complaints of discrimination. *Id.*  Similarly here, I cannot fairly say that Mr. Shaffer's involvement was active throughout the *Hall* litigation.  It appears to have begun as reactive isolated participation in the

---

under the FLSA.  *See Clark Cty. Sch. Dist.* v. *Breeden*, 532 U.S. 268, 274 (2001) (per curiam).  IEP fails to adduce authority holding that federal courts should measure temporal proximity from the very first colorable FLSA-protected activity, rather than from the latest FLSA-protected activity preceding the adverse employment action.  I see no reason to adopt IEP's approach.

  For the same reason, I reject IEP's argument that I should measure from January 2017, when it deposed Mr. Hall and became aware of Mr. Shaffer's indirect involvement in the *Hall* litigation.  Mr. Shaffer's subsequent receipt of a subpoena *duces tecum* constituted the statutorily protected conduct under the FLSA and is therefore the earliest proper milestone for determining temporal proximity with respect to his participation in the *Hall* litigation.

form of receiving a subpoena *duces tecum* in February 2017.

The span of over a year between Mr. Shaffer's participation in the *Hall* FLSA litigation in February 2017 and his termination in May 2018 is too distant to support a prima facie case of retaliation. *See Mesnick* v. *Gen. Elec. Co.*, 950 F.2d 816, 828 (1st Cir. 1991) (holding that the nine-month period between the protected conduct and the alleged retaliation undermined the inference of causation); *Murray* v. *Warren Pumps, LLC*, 821 F.3d 77, 88 (1st Cir. 2016) ("[C]omplaints occurred six months to a year prior to his termination, which is too remote in time from the adverse employment action to establish a retaliation nexus . . . .").

> b.   *Timespan Between Mr. Shaffer's Filing of an FLSA Suit and Termination*

Mr. Shaffer does not expressly allege or clearly argue that I should determine temporal proximity based on the time span of slightly less than three and a half months separating his filing of this FLSA suit on January 26, 2018, and his termination on May 8, 2018. Rather than finding that his attorney's indolent pleading and cursorily crafted briefing ends the matter, I will address the question as the foundation for entering a procedural order requiring him to conform the operative pleading by the end of this month or suffer dismissal. *See supra* note 19.

Temporal proximity can support an inference of causation,

but this inference weakens with the passage of time.  Case law finding that temporal proximity alone supported an inference of retaliation has permitted a gap of just a few months between an employee's protected conduct and adverse employment action against him.  *See, e.g.*, *Calero-Cerezo* v. *U.S. Dep't of Justice*, 355 F.3d 6, 25 (1st Cir. 2004) (one month); *Mariani-Colón*, 511 F.3d at 224 (two months).  Mr. Shaffer relies upon a gap of just over three months.  The longest period that the First Circuit has held supported a prima facie case on summary judgment appears to be three months.  *See Sánchez-Rodríguez* v. *AT & T Mobility P.R., Inc.*, 673 F.3d 1, 15 (1st Cir. 2012). Nevertheless, three months appears to present the uncertain borderline of temporal proximity that alone supports an inference of retaliation.  *See Pena* v. *Honeywell Int'l, Inc.*, 923 F.3d 18, 32 (1st Cir. 2019) ("The gap of four months, on its own, is not 'very close' for establishing causality." (quoting *Cherkaoui* v. *City of Quincy*, 877 F.3d 14, 29 (1st Cir. 2017)); *Calero-Cerezo*, 355 F.3d at 25 (noting that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity"); *Colburn* v. *Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 337-38 (1st Cir. 2005) (finding no "inference of retaliatory motive" where plaintiff "began to take leave [under the FMLA] . . . and was not terminated until almost four months later").  *But see*

*Garayalde-Rijos* v. *Municipality of Carolina*, 747 F.3d 15, 25
(1st Cir. 2014) (holding that a five-month gap is sufficiently
proximate to survive a motion to dismiss).

Ultimately, an inference of retaliation can survive a lack
of close proximity when the passage of time "is merely one
factor relevant to causation." *Id.* And where a longer time
span does not independently raise an inference of retaliation,
it may nevertheless be "reinforced by other evidence"
corroborating an inference of retaliation. *Trainor* v. *HEI
Hospitality, LLC*, 699 F.3d 19, 28 (1st Cir. 2012); *see also
Shinseki*, 629 F.3d at 58 (same). Because "the significance of
any given act of retaliation will often depend upon the
particular circumstances[,] [c]ontext matters." *Planadeball* v.
*Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 178 (1st Cir.
2015) (quoting *Burlington N.*, 548 U.S. at 69).

Here, Mr. Shaffer had received only positive performance
reviews up through February 2017. After his participation in
the *Hall* litigation became known on February 27, the pattern of
positive reviews for his performance began to deteriorate with
unexpected criticism from IEP supervisors escalating into a
series of reprimands that finally culminated in his termination.
The Defendants, for their part, have not attempted to explain
why all three reprimands were delivered at the same time,
October 11, 2017, when each bore earlier dates, one at least

40

nine days prior.  The post-dated delivery of the reprimand
suggests development of pretext.

The written reprimands that rained down on Mr. Shaffer were
delivered to him just a week after he emailed the Defendants a
memorandum entitled, "The Elephant in the Room."  That
memorandum unambiguously raised his concerns that he was "being
pursued and persecuted and bullied due to his involvement in the
Hall litigation."

Other disciplinary activity Mr. Shaffer confronted,
following the October 11, 2017 warnings and reprimands, does not
dissipate the developing cloud of retaliatory animus.  For
example, in late October 2017, IEP undertook to discipline Mr.
Shaffer by suspending him (as a preliminary step in the
termination process) for allegedly "refusing to answer an
emergency call."  However, after an internal investigation, IEP
determined that it lacked a factual basis for that disciplinary
action and rescinded the suspension.  It was not until the final
reprimand some six months later in April 2018, for failing to
flag what could be termed a labeling problem in an inspection
report, that IEP implemented the cognizable adverse employment
action of termination.  The circumstances of the termination
itself suggest retaliatory animus because a different IEP Field
Service Engineer subsequently agreed with Mr. Shaffer's

assessment – and IEP now concedes that Mr. Shaffer's report was correct if incomplete.

To survive summary judgment, Mr. Shaffer must show specific admissible facts "from which a reasonable factfinder could infer that the employer retaliated against him for engaging in the protected activity." *Blackie*, 75 F.3d at 723. He has done so here. In light of the strong suggestions of pretext arising from the string of warnings and reprimands that IEP relied on to justify Mr. Shaffer's termination, I find that the gap of less than three and half months between his filing of the instant FLSA suit and his termination suffices to establish a prima facie case in the summary judgment record now before me.

### 3.  Facially Legitimate Non-Retaliatory Reason

At the summary judgment phase, the "juxtaposition of the [employee's] prima facie case with [the employer's] proffered reason makes further use of the burden-shifting framework unnecessary." *Harrington*, 668 F.3d at 32. At this point, the question becomes whether a reasonable factfinder could infer that Mr. Shaffer was fired for his FLSA activities, rather than for inefficiencies or errors at work.

Although a "properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation," *id.* at 33 (quoting *Shinseki*, 629 F.3d at 54), the

First Circuit has warned that "[c]ourts should be especially cautious before granting summary judgment when pretext and retaliatory animus are at issue," *id.*

Here, the parties present two competing arguments regarding the facts leading up to the adverse employment action of termination.  The conflicting narratives underscore a genuine dispute of material fact that precludes summary judgment. "[W]here the issue at bottom comes down to a determination of [an employer's] motive and intent, the court's mandate is to defer to the [factfinder]." *Mogilevsky* v. *Wellbridge Club Mgmt., Inc.*, 905 F. Supp. 2d 405, 413 (D. Mass. 2012) (internal quotation marks omitted).

I need not proceed to the third step of the *McDonnell Douglas* analysis because I have observed that the record presents factual issues concerning pretext that necessarily foreclose a summary judgment disposition.

\*   \*   \*   \*

IEP's motives for terminating Mr. Shaffer are adequately disputed on the record before me and must be decided by a factfinder.  I will deny the Defendants' motion for summary judgment on Count II.

### III. CONCLUSION

For the reasons set forth more fully above, I DENY the Defendants' renewal of the Motion [Dkt. No. 73] for Summary

Judgment, without prejudice to its reconsideration upon
Defendants' motion of resubmittal and likely consequent
allowance if the Plaintiff does not, on or before August 31,
2021, in accordance with this Memorandum and Order and a
Procedural Order to be issued separately later today, file an
amended complaint conforming to the evidence, including an
express claim that he suffered adverse employment action by
termination.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE